1    UNITED STATES DISTRICT COURT

2    DISTRICT OF MAINE

3

4    UNITED STATES OF AMERICA    )
                                 )
5                                )        CRIMINAL ACTION
           vs.                   )
6                                )    Docket No. 1:13-cr-00011-JAW
                                 )
7    LORNE LYNN ARMSTRONG        )        DETENTION HEARING
     aka LORNE_A_20014,          )
8                                )
                Defendant.       )
9

10

11                   TRANSCRIPT OF PROCEEDINGS

12        Pursuant to notice, the above-entitled matter came on

13   for DETENTION HEARING before the HONORABLE JOHN C. NIVISON,

14   in the United States District Court, Bangor, Maine, on the

15   22nd day of August, 2019, at 10:11 a.m.

16

17

18   APPEARANCES:

19   For the Government:              Andrew McCormack, Esquire

20   For the Defendant:              Matthew D. Morgan, Esquire

21   For U.S. Probation:             Maria Schokman

22

23                   Julie G. Edgecomb, RMR, CRR
                        Official Court Reporter
24

25   Proceedings recorded by mechanical stenography; transcript
     produced by computer.

1        (Defendant present with counsel in open court.)

2                THE COURT:  Thank you.  Good morning.

3                MR. McCORMACK:  Good morning.

4                MR. MORGAN:  Good morning, Your Honor.

5                THE COURT:  We are here in the matter of the

6    government versus Lorne Armstrong on the defendant's motion to

7    reopen the detention hearing.  We did have a detention hearing

8    -- a hearing on the issue of detention, and the court ordered

9    that he was detained -- to be detained, subject to his ability

10   to seek the court's reconsideration of that through reopening

11   the issue.  And at the time, there was a question of whether

12   Mr. Armstrong would be readmitted or part of sex offender

13   therapy, that was at least one of the precipitating factors

14   for the motion, and I know that was an issue that was not

15   addressed, at least to my satisfaction, at the last hearing,

16   and so as part of the motion, there has been an assertion that

17   he is eligible and has found a replacement program.  So that's

18   the basis of the motion.

19        Mr. McCormack, from the government's standpoint, does the

20   government contest the reopening, or does the government

21   simply contest whether he should be released?  Where is the

22   government on it?

23                MR. McCORMACK:  It's the latter, Your Honor.

24                THE COURT:  The latter?

25                MR. McCORMACK:  So we're -- the government is not

1    against reopening the hearing --

2              THE COURT:  Okay.

3              MR. McCORMACK:  -- but does believe that the

4    defendant should be detained, yes.

5              THE COURT:  Okay.  And -- and for the record, the

6    information provided with respect to a possible treatment

7    program wasn't available at the time of that initial hearing,

8    so I would probably agree that the government's concession is

9    consistent with the standard.  So without objection, we'll

10   grant the motion to reopen.

11        And so then the issue becomes whether there are

12   conditions that Mr. Armstrong could be released.  It is the

13   defendant's burden here at this point to establish by clear

14   and convincing evidence.  Mr. Morgan, are you ready to

15   proceed?

16             MR. MORGAN:  I am, Your Honor, yes.

17             THE COURT:  Are you going to proceed by way of

18   testimony or proffer?

19             MR. MORGAN:  Proffer, Your Honor, the evidence --

20             THE COURT:  Okay.  You may proceed.

21             MR. MORGAN:  -- the evidence submitted with the

22   motion.

23        The court made a determination when we were here last

24   time, a couple weeks ago, that Mr. Armstrong carried the

25   burden in terms of the risk of flight.  There's been no change

1 in circumstances. Is the court fine with me not readdressing

2 flight?

3          THE COURT: Unless the government believes the risk

4 of flight -- I didn't understand the risk flight to be the

5 government's concern in any event.

6          MR. McCORMACK: That's correct, Your Honor.

7          THE COURT: Okay.

8          MR. McCORMACK: That's not what it is.

9          THE COURT: Okay. You may proceed.

10          MR. MORGAN: Okay. Great. Then I'll just go right

11 to the heart of the matter.

12     This was emphasized the last time, so I don't want to

13 belabor the point, just be efficient, but in terms of carrying

14 his burden, the sort of primary piece of evidence that Lorne

15 points to about risk to the community is the government's own

16 petition. At this point, the revocation report's been made

17 available, too.

18     There's no concrete assertion, even by the government,

19 that he was a risk to minors in the sense that he was a risk

20 from a sex offender treatment standpoint under his --

21 basically, the underlying conviction here, meaning he hasn't

22 reached out to any young people on the Internet, there's been

23 no claim here that he has. There was no allegation that his

24 drinking caused him to be a risk to the community, namely,

25 there was no allegation that, for example, he drives a truck,

1  that he was drinking during work hours, no allegation that

2  drinking caused him to reach out to minors on the Internet.

3      The issues, from what I understand it, are that he drank

4  and lied and that his lying and drinking caused him to be

5  suspended from treatment.  So there's certainly a hypothetical

6  risk that if he's untreated as a sex offender, that he could

7  be a risk to the community.  So the conditions that

8  Mr. Armstrong proposes to be released on would -- in terms of

9  the alcohol, first, would be that he continue AA.  Probation's

10 acknowledged that in June of 2017, he presented his probation

11 officer -- I believe it was the probation officer here -- with

12 his AA chip.  He would continue with AA.  He would be willing

13 to be monitored by an alcohol device again, which is one of

14 the recommendations sought in the final report, and he also

15 would be willing to enter into substance abuse counseling at

16 the same time as his sex offender treatment.  So that's to

17 address any concern that his drinking would be a risk to the

18 community, even though there's no evidence to show that it has

19 been historically so far.

20     The second piece is the sex offender treatment.  I did

21 speak with Mr. Hogan.  He confirmed that Mr. Armstrong -- and

22 Dwayne Hogan is the treatment provider who suspended

23 Mr. Armstrong.  He confirmed that suspended did not mean Lorne

24 was not allowed to come back.  He confirmed that suspended, in

25 fact, meant that he would be allowed to come back, but not

until after he had been punished.  He told me the reason for
that was that if Mr. Armstrong was allowed to lie and return
to treatment without any punishment, that, in his words, would
spread like wildfire among the other people being treated.
It's a group therapy, and that's a fair reason; I can
understand Mr. Hogan's position.  I asked him if he had an
opinion about whether Lorne obtaining counseling elsewhere,
outside of his facility, would be sufficient to address his
risks, and he told me he didn't have an opinion on that.  That
was his answer to me.

We did find -- Lorne reached out to treatment providers.
He found one here in the Bangor area; that's Exhibit A to his
motion to reopen the hearing.  They have immediate openings.
They provide both individual and group sex offender treatment.
I disclosed to them the basis of why he was seeking treatment
with them, namely, that he had lied to his previous provider.
They did not say that that would keep them from treating him.

So at this point, he has sex offender treatment services
that he's willing and able to pay for.  He's willing to be
monitored from an alcohol standpoint, and there hasn't been
any allegation that either of those two things, either the
lack of treatment -- I'll put that aside -- that his drinking
caused a direct risk to the community, and he's addressed the
issue about the sex offender treatment counseling by finding
new counseling.

1    So based on that, he's carried his burden to show by

2  clear and convincing evidence that he should be released.

3  This isn't a question about whether he should be punished;

4  simply a question about whether he should be released pending

5  his final hearing.

6          THE COURT:  Thank you.

7  Mr. McCormack?

8          MR. McCORMACK:  Yes, Your Honor.  First, just in

9  terms of the drinking, the government takes issue with the

10  fact that the fact that he's drinking doesn't lead to an

11  increased risk; the government believes that it does.  And in

12  my conversations with probation is that when you drink, your

13  inhibitions are less, and -- and based on his prior

14  conviction, I think it does increase the risk.  Now, there is

15  no evidence that I've seen at this point that he has reached

16  out to minors, but I think drinking, in combination with his

17  prior history, is a risk.

18    And in addition, Your Honor, I do think that it's

19  significant that these are not one-off drinking things that he

20  has been involved with.  I mean, one of the quotes -- one of

21  the statements from the -- from the petition say that on

22  July 24, 2019, Armstrong -- Armstrong admitted to probation he

23  had consumed alcohol on July 7, 2019, and reported he had been

24  consuming alcohol on a weekly basis since the complete of

25  Soberlink testing on December 4 of 2017, and he consumes on

1   average seven to twelve beers in a sitting.

2        So I think the risk, Your Honor, is not only that he

3   seems to have a very serious issue with alcohol, but also that

4   he seems to just frankly be ignoring the rules, which I think

5   is -- is a concern, that he just -- he finishes his Soberlink

6   training, he thinks he can continue to go on drinking without

7   -- without any repercussions, and I think the fact that he is

8   willing to ignore those rules, in combination with the fact

9   that we do have evidence, as well, too, or at least there is

10  an allegation about his involvement in getting a smartphone,

11  which, again, is ignoring the rules that are clearly laid out

12  for him, I think those are all risks to the community, and I

13  think that simply -- basically, what I feel like is happening

14  in this case is that he gets kicked out of a sex offender

15  program and he goes and finds another one, that I'm not sure

16  that that really addresses the risks involved.

17       So I think that detention is appropriate, Your Honor.

18            THE COURT:  Do we -- do you know what the guideline

19  range is if there is a violation here?

20            MR. McCORMACK:  I'm --

21            MR. MORGAN:  Three to nine months is my

22  understanding.

23            THE COURT:  Three -- three to nine?

24            MR. MORGAN:  Yes, Your Honor.

25            THE COURT:  Thank you.

1     Probation want to weigh in on this or add anything,

2 Officer Schokman?

3          MS. SCHOKMAN:  Your Honor, I would just add that,

4 like -- like it was already stated, that the alcohol is an

5 issue with lowering inhibitions.  And there was an issue with

6 Mr. Armstrong throughout supervision in having conversations

7 over the phone with females that he had never met, and we

8 could not determine what their -- what their ages were.  So

9 that continued interaction with people online that he is

10 unaware of who they are goes back to his original offense and

11 that is a risk.

12          THE COURT:  Tell me the relationship between his

13 conduct that you were monitoring and the original offense.

14          MS. SCHOKMAN:  The original offense had to do with

15 having a conversation with a person he believed to be an

16 underage female online, that he continued to have this

17 conversation, and then he went to meet with this person, but

18 it was actually an undercover agent.  And that, in the eyes of

19 probation, correlates with the same behavior now of having

20 conversations with females on the phone, we don't know their

21 ages, we can't confirm if they are adults or not.

22          THE COURT:  And what was the -- was the -- was

23 probation or some law enforcement able to monitor the

24 substance of those communications?

25          MS. SCHOKMAN:  We were not able -- to a limited

1   degree.  We were checking text messages, and we would receive

2   anonymous e-mails and phone calls about his behavior with

3   links to recorded conversations he had had with females over

4   the phone.

5        One of those conversations that is included in the

6   revocation report, he had asked one of the females to provide

7   sexual images of herself and to send them through the mail so

8   that probation would not be able to find them.

9             THE COURT:  How long ago was that?

10            MS. SCHOKMAN:  May I check my record?

11            THE COURT:  Sure.

12            MS. SCHOKMAN:  That was in February of 2018.

13            THE COURT:  And has there been any -- any of these

14   communications or any communications that have been checked,

15   to your knowledge, have they involved in any way someone who

16   was a minor?

17            MS. SCHOKMAN:  So there was a conversation that

18   Mr. Armstrong -- he had called me on the phone -- this is not

19   highlighted in the report -- but --

20            THE COURT:  Approximately when was this?

21            MS. SCHOKMAN:  This was approximately five or six

22   months ago.

23            THE COURT:  Okay.

24            MS. SCHOKMAN:  That he had called me and asked a

25   request to move -- or go out to California to meet with this

1    individual he had been speaking with over the phone, that he

2    had never met, we had no proof of who she was, and he was

3    informed by associates of hers that she was in the ICU and she

4    was very sick.  He had requested to go out to California and

5    to marry her as her last request because he was informed that

6    she may pass away.  And he had sent me an image of a female

7    that he believed to be this individual in the hospital.

8         Upon doing an exam on that image by my office, we found

9    out that that was actually an image of a 15-year-old girl who

10   was in a coma based out of a London newspaper.

11             THE COURT:  The photo was out of a newspaper?

12             MS. SCHOKMAN:  Yes.  That somebody had sent to him

13   to make him believe that it was that individual, and that is

14   concerning to U.S. Probation because that proves my point that

15   we don't know who these people are or what their ages are, and

16   he was under the impression that this was an adult female

17   when, in reality, this was an image of a 15-year-old girl in a

18   coma.

19             THE COURT:  Had he received that image?

20             MS. SCHOKMAN:  He explained to me that her -- this

21   individual's associates had sent him that image over the

22   phone.

23             THE COURT:  Is it apparent -- is the -- is the

24   person's relative age apparent from reviewing the photo?

25             MS. SCHOKMAN:  No, Your Honor.  She looked young,

1   but I could not tell that she was of age or not.

2           THE COURT:  And how was that resolved?  Did he --

3   was he granted permission to go?  Was he confronted with what

4   the reality was?  How did that resolve?

5           MS. SCHOKMAN:  Yes.  His request was denied, and I

6   explained to him what we had found, that this was not the

7   person he thought it was, and he was very upset that they had

8   lied to him, but then months later, he continued to engage

9   with those same individuals who had been lying to him.

10          THE COURT:  You mean the associates of this

11  person --

12          MS. SCHOKMAN:  Yes.

13          THE COURT:  -- or the purported associates of this

14  person?

15          MS. SCHOKMAN:  Yes.

16          THE COURT:  Okay.  And how long did that go on?

17          MS. SCHOKMAN:  To my knowledge, that has continued

18  to go on throughout his supervision.

19          THE COURT:  Continued to communicate with those

20  individuals?

21          MS. SCHOKMAN:  Over the phone.

22          THE COURT:  And where are they located?  Do we know?

23          MS. SCHOKMAN:  We do not.

24          THE COURT:  Are they women?

25          MS. SCHOKMAN:  Yes.

1          THE COURT:  And the government has mentioned and you

2   have mentioned alcohol consumption as being an issue.  Is

3   there any evidence of alcohol use during like this incident

4   with the -- the communications with the person who turned out

5   to be 16 years old, or her associates, anyway, or any of the

6   other commun -- communications about which probation is

7   concerned?

8          MS. SCHOKMAN:  So one of the links that U.S.

9   Probation was sent, there was an audio clip of Mr. Armstrong

10  having a conversation with a female over the phone.  It was --

11  he appeared -- or he sounded as if he was intoxicated, he was

12  slurring his words.  So we confronted him about that audio

13  clip, and he had admitted to my supervisor that he had been

14  drinking during that conversation and that was, in fact, him

15  on the phone.

16         THE COURT:  I note on the docket that there was

17  relatively recent, within the last month and a half or so, a

18  request that was not objected to by Mr. Armstrong for a

19  modification of his conditions, which imposed, I guess, the --

20  what I would consider the computer monitoring condition or

21  Internet monitoring; is that right?

22         MS. SCHOKMAN:  That was updated language recently.

23         THE COURT:  Right.

24         MS. SCHOKMAN:  We had --

25         THE COURT:  It was already -- it was always there,

1    wasn't it?

2            MS. SCHOKMAN:  Yes.

3            THE COURT:  And what was the reason -- was there any

4    particular reason why the -- it was modified in July, or was

5    that just modified language that became standard from

6    probation's perspective so they sought to modify it in every

7    case in which the computer monitoring condition had been

8    imposed?

9            MS. SCHOKMAN:  That's correct.

10           THE COURT:  Okay.  All right.  And so what is

11   probation's view on the proposed release plan?

12           MS. SCHOKMAN:  The proposed release plan in

13   reference to the treatment sought, my one question was, when

14   we were sent the information about the program, it had listed

15   all the costs.  Because this is not a contracted provider,

16   probation would not have the ability to pay for that.

17       Regardless of that, though, like already stated, we do

18   not feel that it reduces his risk because of his continued

19   lack of compliance.

20           THE COURT:  And in terms of the information that

21   probation has available, approximately when was the most

22   recent time you believe Mr. Armstrong made contact, through

23   means of Internet or otherwise, with someone with whom he was

24   seeking to engage in some relationship, a woman or somebody --

25   a female that he was looking to engage in some relationship?

1      MS. SCHOKMAN:  Approximately within the last two

2  months he has continued to do that.

3      THE COURT:  He has continued to do that?  And what

4  -- how was that evidence brought to your attention?  How do

5  you know of that?

6      MS. SCHOKMAN:  He continued to bring up the issue of

7  these females to probation because he wanted to be allowed to

8  continue to have these conversations, and he believed that

9  continued conversations with these females would -- because

10  there are many people on the Internet that have very negative

11  -- that have posted very negative information about

12  Mr. Armstrong, and he thought that the continued conversations

13  with these people would help vindicate him in some way.  So he

14  would continue to talk about it with probation.

15      THE COURT:  And would he -- do you know whether he

16  made -- how he made contact with these individuals and whether

17  the means of contact was permitted under the term -- or not

18  prohibited by his conditions of release?

19      MS. SCHOKMAN:  He had been told multiple times not

20  to engage with these females because of our concern that we

21  did not know who they were or what their ages were.

22      In addition, he was initially trying to talk to these

23  women and individuals online about his crime and how he didn't

24  do anything wrong and was trying to sell items associated with

25  his case.

1          THE COURT:  I don't understand that.

2          MS. SCHOKMAN:  So initially when he was allowed to

3    have Internet access, he had a YouTube channel where he was

4    trying to sell hats and other items because he had garnered a

5    lot of Internet attraction from him being on TV from his

6    original case.

7          THE COURT:  His original case had some TV

8    relationship?

9          MS. SCHOKMAN:  Yes, he was on To Catch a Predator.

10         THE COURT:  And so when was it that he was permitted

11   to have Internet access?  Is that -- and then was it shut down

12   at some point?

13         MS. SCHOKMAN:  Yes.

14         THE COURT:  So when was he -- how long a period of

15   time that he was allowed to have this Internet access and when

16   was it changed?

17         MS. SCHOKMAN:  From approximately 2015, before I had

18   the case, with Officer Oswald until 2017, when we started

19   receiving anonymous e-mails about his behavior online and my

20   office then restricted the Internet access.

21         THE COURT:  As of 2017?

22         MS. SCHOKMAN:  Yes.

23         THE COURT:  Okay.  And yet you maintain that he --

24   and have evidence that he continued to after that?

25         MS. SCHOKMAN:  Yes.

1          THE COURT:  And the people that he's been speaking

2     with most recently, your evidence suggests maybe as recently

3     as two months ago, was there any way he could have contacted

4     them other than through the Internet?  Do you know?

5          MS. SCHOKMAN:  He was speaking to them over the

6     phone.

7          THE COURT:  You don't how the first contact

8     occurred?

9          MS. SCHOKMAN:  No.

10          THE COURT:  All right.  It could have been or could

11     not have been, but you don't have any evidence that it was via

12     the Internet, right?

13          MS. SCHOKMAN:  There was these -- these people

14     stemmed from a group that were online that were following him

15     because of his original case.

16          THE COURT:  Okay.  All right.  So is that where --

17     when you talk about these women that he had spoken to, were

18     all of these in -- similarly situated in the sense that they

19     had had some -- had followed him in some way on social media,

20     or whatever, because of this -- this -- his prior case, or do

21     you not know one way or the other?

22          MS. SCHOKMAN:  Some of the individuals.

23          THE COURT:  Some?

24          MS. SCHOKMAN:  I --

25          THE COURT:  Okay.

1          MS. SCHOKMAN:  Yeah, he had indicated.

2          THE COURT:  All right.

3          MS. SCHOKMAN:  As to all of them, I'm not sure.

4          THE COURT:  All right.  Is there anything else that

5    you'd like to add?

6          MS. SCHOKMAN:  No, Your Honor.

7          THE COURT:  Okay.  Mr. Morgan, is there anything

8    you'd like to address, or is there anything you'd like to ask

9    of probation, of Officer Schokman?  Given my inquiry, you

10   should feel free to do that, as well.

11         MR. MORGAN:  I -- I would just address a couple

12   things, and if Officer Schokman thinks that I'm being

13   inaccurate, please stand up and tell me kind of -- so I think

14   it might be easiest that way.

15         THE COURT:  Sure.

16         MR. MORGAN:  I do think the context of what has

17   happened with this case is important, and I should have

18   mentioned that before, but now Maria has gone through a decent

19   amount of it.

20       This isn't attention that he necessarily wants when, you

21   know, vindicating himself, etc.  I mean, there are people who

22   have been sending inappropriate e-mails to his mother, who's

23   here today.  The Internet is a terrible place for things like

24   this, and the reality is that he can only control so much of

25   this.  So I think that the sort of notoriety that he has

1    should be viewed from that context.

2         In terms of the 15-year-old or 16-year-old -- I forget

3    which age once it was analyzed by probation -- it's a prime

4    example of him apparently following what he was supposed to do

5    on probation.  He reached out to them; he told them; he asked

6    for permission; permission was denied; and he didn't go.  It

7    sounds like he -- he has people looking to set him up to fail

8    on the Internet, and he may have poor judgment about who he

9    should be interacting with.  But so long as there's evidence

10   that he's trying to clear things with probation and not going

11   over their head, then I think that's an example of him doing

12   what he was supposed to under his terms of probation.  So

13   there's no reason to think he wouldn't do the same if released

14   on conditions.

15        The -- the relationships with adults, there's no

16   condition he's not allowed to have either sexual or, for that

17   matter, friendships.  He tells me these are friendships with

18   people who are of age.  He's allowed to have relationships

19   with people; it'd probably be healthy for him to do so.  So I

20   think him interacting with people in and of itself, especially

21   if it's by phone once he's not allowed Internet, is

22   appropriate, and, again, evidence that he's willing to follow

23   conditions.

24        It's his drinking that he's had trouble with, and he

25   needs counseling for that, and he's willing to do counseling

1  and have the monitoring device as a condition of release.  So

2  I think his disclosures to probation actually bode in his

3  favor -- favor.

4       And I forgot to mention, but he would be willing to

5  obviously execute any releases necessary with a new treatment

6  provider so probation would have all information with them and

7  able to contact them.

8            THE COURT:  Thank you.

9       Mr. McCormack, anything you'd like to add?

10           MR. McCORMACK:  Nothing further, Your Honor.  Thank

11  you.

12           THE COURT:  And did you have any questions you

13  wanted to ask Officer Schokman?

14           MR. McCORMACK:  No, I don't, Your Honor.

15           THE COURT:  Okay.  Well, let me -- I'll return to

16  kind of what brought us here, at least in part.  We had the

17  initial appearance and the hearing on the issue of release or

18  detention, and at that time -- and this is sometimes,

19  unfortunately, what we're presented with, where at the initial

20  appearance and the requirement that somebody be seen without

21  unnecessary delay, usually the same day, sometimes challenging

22  for all parties to be able to garner all the information

23  necessary to those decisions -- and I think at the time,

24  Officer Schokman, who just provided, you know, a fair amount

25  of information here, was out of state on office business, but

1   was not present, and so there was another probation officer

2   who had pinch-hit for her.  So we were somewhat limited --

3   everyone was somewhat limited in the information.

4        And at the time, the issue seemed to be the --

5   Mr. Armstrong's dismissal or suspension from the sex offender

6   treatment program due to his lack of candor with respect to

7   his drinking and how that affected the ability to main -- of

8   the group -- him to continue in the group, and I think

9   Mr. Morgan has shared with us Mr. Hogan's reasoning in that

10  suspension, which, again, seems to make some sense in terms of

11  how an immediate return without any consequence that they can

12  point to may affect the group dynamic and the ability of the

13  leaders of those groups to hold people accountable, so I can

14  understand -- I can understand that.

15       And so at the time, if the issue was whether there could

16  be some other treatment program to get him engaged in and also

17  address that substance abuse problem, then it may be a case

18  where he could be released.  That's kind of the history that

19  brought us here.  And today what's been proffered is, in fact,

20  a plan to address both the substance abuse issues and the sex

21  offender treatment by getting, in essence, treatment and

22  monitoring in both cases.

23       And it -- the defendant's argument here, it does have

24  some appeal in that it seems to address the issues that were

25  of concern, and, frankly, if that were all -- the only

1    information that was presented, I -- you know, I think I would

2    maybe look favorably upon Mr. Armstrong's request here.

3        I must concede that the information that has been shared

4    today regarding Mr. Armstrong's conduct while on probation is

5    concerning.  I have no basis to say what the motivation was.

6    Mr. Morgan makes a valid point in that there's nothing that

7    I'm aware of that prohibits Mr. Armstrong from engaging in

8    communications with, relationships with adult women, and

9    there's nothing that -- the underlying allegations are not

10   suggestive of any misdeeds in that respect.

11       The concern that the information here raises are as

12   follows:  One is that Mr. Armstrong has, it sounds like,

13   fairly consistently while upon release deliberately engaged in

14   conduct that he knew was prohibited by his conditions.  The

15   alcohol is the most obvious -- the alcohol use is most

16   obvious.  The use of the Internet and devices that he was

17   prohibited from using is another one, and that's challenging

18   to monitor.  And perhaps one of the most concerning things

19   that I heard was his attempts at deceit when he was told --

20   and, again, I know this is by proffer -- when he said, and I

21   think I understand that there's evidence of this from at least

22   somebody who has reported to probation, that he asked that

23   explicit photos be sent -- and, granted, not of a minor -- but

24   be sent in a way so as to make sure that probation was not

25   aware of it, and if, in fact, Mr. Armstrong was engaging in

1   behavior that he knew was permissible and appropriate, there'd

2   be no reason to be concerned about whether probation was aware

3   of it or became aware of it at all -- none.

4       And this continued -- and, again, I -- I don't know the

5   full back story to the prior case and the fact that, at least

6   from Mr. Armstrong's perspective, he's attempted to kind of

7   clear his name in the public domain or would like to clear his

8   name in the public domain, and I can appreciate that if, in

9   fact, there is information out there that is hurtful to him

10  and his family.  I can't today assess that that's the mot --

11  it may well be the motivation.

12      Another interpretation, however, and I think -- although

13  Officer Schokman did not articulate this -- it seems to be at

14  least implicit in probation's position and assessment here --

15  is that -- another interpretation is that he welcomes the

16  attention, to some degree.  If you -- if the information about

17  selling items or memorabilia or something that commemorates

18  this -- the incident is accurate -- I don't know that it is --

19  it's been proffered here today as -- as something that

20  occurred -- and the continued interaction with people

21  affiliated with that case and the notoriety that went with it

22  can be interpreted as wanting to facilitate that or -- as

23  opposed to clear his name.  And, again, I'm not making any

24  determinations as to what the motivation was.  It'd be -- I'd

25  be hard-pressed based on the evidence through proffer to make

1　that determination.

2　　But I point all those things out because those are

3　concerning factors so that if you were to look at this and say

4　he has an alcohol problem that's untreated, he's continued to

5　have -- to engage in what can at least be construed as risky

6　behavior in the sense of risking a proceeding like this, and

7　what's compelling him to engage in that when he knows this is

8　the consequence, that's real concerning and presents -- that

9　presents that -- just underscores that safety concern.

10　　And when you have those two potential interpretations,

11　oftentimes in cases it comes down to the burden of proof, and

12　not only does the defendant have the burden here, it's a high

13　burden, it's a clear and convincing evidence standard.  And

14　the requirement -- what I would have to do to say that the

15　safety concern that has at least been presented today, which

16　is much more crystallized than it was when we were before the

17　-- when we were together last time, I'd have to find that, by

18　clear and convincing evidence, that the conditions would

19　address the safety concerns.

20　　And while objectively you may be able to say, look, if he

21　addresses the alcohol and -- and -- and if he gets back into

22　sex offender treatment, that should do it, well, with somebody

23　who has been in compliance and hasn't been -- made attempts to

24　engage in conduct without detection by probation and engaged

25　in conduct that was in deliberate violation and there's no

1  argument to be made that he didn't -- wasn't aware of the

2  conditions, I simply can't get to that level of clear and --

3  that I'm convinced by clear and convincing evidence that these

4  conditions would address the safety concerns.

5  I do appreciate the fact that, Mr. Morgan, you have taken

6  the steps to address the concerns that were raised at the

7  initial appearance here, and I'm certainly sensitive to the

8  fact that when the court identifies the areas of concern and

9  then somebody attempts to address those concerns, there's a

10  conclusion that it's not sufficient.  It's not sufficient in

11  this instance because of the additional information that is

12  available to me now that wasn't then, and --

13  MR. MORGAN:  Understood.

14  THE COURT:  -- had it been available, I probably

15  would have identified other areas of concerns.  So I do not

16  want you to think that your efforts were for naught or not

17  appreciated by the court and your attempt to address the

18  concerns.

19  MR. MORGAN:  Understood.  Thank you.

20  THE COURT:  I understand them.  So while we're going

21  to grant the motion to reopen the -- well, we have granted the

22  motion to reopen the detention hearing, I'm going to deny the

23  defendant's request for release upon conditions for the

24  reasons I've just articulated.

25  Are there any other issues that the government would like

1    the court to address?

2             MR. McCORMACK:  Nothing else from the government.

3    Thank you, Your Honor.

4             THE COURT:  Mr. Morgan, anything?

5             MR. MORGAN:  Nothing else, Your Honor.  Thank you.

6             THE COURT:  Officer Schokman, anything?

7             MS. SCHOKMAN:  No, Your Honor.

8             THE COURT:  Thank you.  We'll be in recess.

9        (Proceedings concluded at 10:49 a.m.)

10                          CERTIFICATION

11       I certify that the foregoing is a correct transcript from

12   the record of proceedings in the above-entitled matter.

13

14

15   /s/ Julie G. Edgecomb_____        October 21, 2019___
     Julie G. Edgecomb, RMR, CRR        Date
16   Official Court Reporter

17

18

19

20

21

22

23

24

25