UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | No. 1:13-cr-00011-JAW |
| | ) | |
| LORNE LYNN ARMSTRONG, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON DEFENDANT'S MOTION FOR
EARLY TERMINATION OF SUPERVISED RELEASE**

Due to the nature and circumstances of his crime, his uneven record on supervised release, the vulnerable character of his purported victim, and the objections of the government, the Probation Office, and his clinician, the Court dismisses a defendant's request for early termination of supervised release.

**I.     BACKGROUND**

On February 6, 2008, a federal grand jury in the Western District of Kentucky indicted Lorne Lynn Armstrong for traveling in interstate commerce for the purpose of engaging in illicit sexual conduct, an alleged violation of 18 U.S.C. § 2423(b) and (e). *Transfer of Jurisdiction*, Attach. 1, *Indictment* (ECF No. 1). On March 31, 2008, Mr. Armstrong pleaded guilty. *Id.*, Attach. 4, *Crim. Docket for Case #: 1:08-cr-00013-TBR-ERG-1* (W.D. Ken. (Bowling Green)) at 2 (*Crim. Docket, W.D. Ken.*). On June 30, 2008, Judge Thomas R. Russell of the United States District Court for the District of Kentucky sentenced Mr. Armstrong to sixty months of incarceration to be followed by supervised release for life, and a $100 special assessment. *Id.*, Attach. 2, *J.*

On July 14, 2008, a Judge of the Court of Justice for the commonwealth of Kentucky sentenced Mr. Armstrong to seven years of incarceration for attempted unlawful transaction with a minor under 16 in the first degree to run concurrently with the federal sentence. *Id.*, Attach. 3, *J. and Sentence on Plea of Guilty* at 3-5, *Ct. of Justice, Commonwealth of Kentucky, Warren Circuit Ct., Div. 1, Docket No. 07-cr-992.* On October 6, 2010, Judge Russell issued an order, amending the judgment to clarify that the June 30, 2008 judgment is to run concurrently with the July 14, 2008 commonwealth judgment. *Id.*, Attach. 3, *Order Am. J.* at 1-2. Mr. Armstrong's supervised release began on November 5, 2012. *Transfer of Jurisdiction* at 1. On January 11, 2013, Judge Russell issued an order transferring jurisdiction of this case to the District of Maine, *Crim. Docket, W.D. Ken.* at 12, and this Court docketed the case on January 15, 2013. *Transfer of Juris.* at 1.

On July 9, 2015, Mr. Armstrong consented to a request for modification of the terms of supervised release, which updated the sex offender treatment, registration, and search conditions, and added a mental health treatment condition. *Req. for Modifying the Conditions or Term of Supervision With the Consent of the Offender* (ECF No. 2); *Order Granting Pet. To Modify Supervised Release* (ECF No. 3).

On October 8, 2015, Mr. Armstrong consented to a request for modification of the terms of supervised release, which added a controlled substance prohibition. *Req. for Modifying the Conditions or Term of Supervision With the Consent of the Offender* (ECF No. 4) (*Oct. 2015 Req. for Modification*); *Order Granting Pet. To Modify Supervised Release* (ECF No. 5) (*Oct. 2015 Order*).

On July 27, 2017, Mr. Armstrong consented to a request for modification of the terms of supervised release, which added a remote alcohol monitoring device condition for a period not to exceed four months and prohibited him from certain alcohol-related situations. *Req. for Modifying the Conditions or Term of Supervision With the Consent of the Offender* (ECF No. 6) (*July 2017 Req. for Modification*); *Order Granting Pet. To Modify Supervised Release* (ECF No. 7) (*July 2017 Order*).

On October 30, 2017, Mr. Armstrong wrote the Court concerning issues with his supervised release and asking for appointed counsel. *Mot. to Appoint Counsel* (ECF No. 8). After Mr. Armstrong filed a financial declaration on November 7, 2017, the Court granted his motion for appointment of counsel. *Order Granting Mot. to Appoint Counsel* (ECF No. 9).

On July 9, 2018, Mr. Armstrong consented to a request for modification of the terms of supervised release, which removed an old computer monitoring condition and added a new computer monitoring condition to conform with the District of Maine's latest version. *Req. for Modifying the Conditions or Term of Supervision With the Consent of the Offender* (ECF No. 11) (*July 2018 Req. for Modification*); *Order Granting Pet. To Modify Supervised Release* (ECF No. 12) (*July 2018 Order*).

On July 25, 2019, the Probation Office (PO) filed a petition for warrant or summons against Mr. Armstrong, alleging five violations of the conditions of supervised release. *Pet. For Warrant or Summons for Offender under Supervision* (ECF No. 13) (*July 2019 Pet.*). On October 1, 2019, Mr. Armstrong came before the Court and admitted four of the violations, *see Min. Entry* (ECF No. 33), and the

Court sentenced Mr. Armstrong to six months of incarceration and supervised release for a term of life. *Revocation J.* at 3-4 (ECF No. 32). The admitted violations included (1) excessive use of alcohol, (2) multiple uses of alcohol after the no-alcohol condition was imposed, (3) failure to submit to required breath tests, and (4) being suspended from mandated sex offender treatment by failing to reveal alcohol use. *Id.*

On January 7, 2021, Mr. Armstrong again moved for appointed counsel, *Mot. for Appointed Counsel* (ECF No. 38), and on January 8, 2021, the Court granted his motion. *Order* (ECF No. 39). On January 26, 2021, Attorney Robert Levine wrote the Court and confirmed that based on discussions with Mr. Armstrong's sex offender counselor, Mr. Armstrong would not file a motion for modification of the conditions of supervised release. *Status Report* (ECF No. 41).

On February 15, 2024, Mr. Armstrong moved again for appointed counsel, *Mot. for Appointed Counsel* (ECF No. 45), and on February 16, 2024, the Court granted his motion. *Order* (ECF No. 46). On May 8, 2024, Mr. Armstrong filed a request for early termination of supervised release. *Def.'s Mot. for Early Termination of Supervised Release* (ECF No. 47) (*Def.'s Mot.*). The Government responded on June 4, 2024 in opposition. *Gov't's Resp. to Def.'s Req. for Early Termination of Supervised Release* (ECF No. 50) (*Gov't's Opp'n*). On June 18, 2024, Mr. Armstrong filed his reply. *Def.'s Reply Mem. In Support of Mot. for Early Termination of Supervised Release* (ECF No. 51) (*Def.'s Reply*).

## II.    THE PARTIES' POSITIONS

### A.    Lorne Armstrong's Motion

Mr. Armstrong moves for early termination under 18 U.S.C. §§ 3583(e)(1) and 3553(a). *Def.'s Mot.* at 1. Mr. Armstrong points out that "[d]uring [his] decade plus on supervised release, it appears, from a review of the docket, that he has only once come before the Court for a hearing on a Petition to Revoke." *Id.* at 3. Mr. Armstrong acknowledges that this petition, which occurred "some four and a half years ago," predominantly involved his "impermissible use of alcohol," but notes that he has not appeared before the Court since October 2019. *Id.*

Mr. Armstrong says that since his release from the incarceration post-revocation judgment, he has "maintained a straight line and he has not been back before the Court." *Id.* In the meantime, Mr. Armstrong has become a father and he "intends to relocate to be with his baby and the mother of his child." *Id.* Mr. Armstrong reminded the Court that his underlying offense was the subject of the American reality television series "To Catch a Predator," and he represented that "a veritable cottage industry of online/internet sites have since been created that are dedicated to Mr. Armstrong, his original offense and the status of his performance on supervised release." *Id.* at 4. He says that he has been "stalked, ridiculed and insulted by this 'community.'" *Id.* Mr. Armstrong states that he receives "hateful mail nearly every day" and his "family has been harassed." *Id.* Mr. Armstrong writes that if the termination is approved, he intends to "relocate and establish a

5

residence/address that is unknown to the people who send these nearly daily communications." *Id.*

Mr. Armstrong maintains that "[a]fter more than 5 years in federal prison and more than a decade of supervised release," he "believes he has learned the lessons our system aims to teach and has attained the stability necessary to move forward with a productive, law-abiding life, in a new relationship and with a new baby." *Id.* He stresses that his one petition on supervised release was "largely centered around his drinking" and he had had "no court involvement for more than four and a half years." *Id.* He asserts there is no "continuing need to protect the public from [him]." *Id.*

## B.   The Government's Opposition

In its opposition, the Government said that it typically defers to the PO in these matters and quotes the position of the PO:

> On June 30, 2008, the defendant was sentenced by the Honorable Thomas B. Russell, United States District Judge for the Western District of Kentucky, to 60 months imprisonment and a lifetime of supervised release following a conviction for one count of Travel in Interstate Commerce to Engage in Illicit Sexual Conduct, 18 U.S.C. §§ 2423(b) and (e). On November 5th, 2012, the defendant began his term of supervised release in the District of Maine. The District of Maine assumed jurisdiction of the case on January 11, 2013.

> On October 1, 2019, the defendant appeared before the Honorable John A. Woodcock, Jr., United States District Judge, for a revocation hearing. The defendant admitted to violating four conditions of supervised release and was sentenced to six months imprisonment to be followed by a lifetime of supervised release.

> On February 5, 2020, the defendant began his second term of supervised release in the District of Maine. Since that time, the defendant has participated in Sex Offender Treatment, and begun

working at his own business, recycling pallets. There have been no instances of noncompliance that have necessitated Court notification.

The defendant now comes before the Court requesting early termination of his term of supervised release. The [PO] respectfully opposes this request based on the nature and circumstances of the offense, and the offender's history and characteristics.

The instant offense in this case involves interstate travel to engage in sexual conduct with a minor, who the defendant believed to be thirteen (13) years of age. The defendant began an online "chat" relationship with the presumed thirteen-year-old, who was in fact a decoy, for approximately 1 month before the offense. In that month, the defendant's chat log grew to over 400 pages. Additionally, the chats included the defendant teaching the decoy to masturbate, transmitting photos of his genitals, and describing, in detail, sexual acts he wished to perform with the decoy. The defendant also encouraged the decoy to delete evidence of their chats. Finally, the defendant traveled over 60 miles to meet the decoy in person.

Throughout his time on supervision, the defendant has participated in the Sex Offender Treatment Program, though he has failed to complete the program. The defendant's conduct, at times, was so disruptive to the group that he was removed in favor of individual treatment. Examples of this disruptive conduct include covertly transmitting the audio from the group via an open phone line, arriving to the group under the influence of alcohol, and failing multiple maintenance polygraph exams, later making accurate disclosures, and admitting to having been deceptive when answering the polygraph questions.

The [PO] acknowledges the harassment the defendant has been subjected to at the hands of many online groups. It is of note, however, that the defendant has, at times, willfully engaged members of these groups, including offering to sell autographed items, and giving interviews. The defendant has been cautioned over the course of several years to cease engaging in these requests, and only very recently has begun to do so.

The [PO's] Administrative Office favors early termination only when specific criteria are met. The defendant fails to meet several of those criteria. First, he committed a sex offense. Second, the defendant, given his previous revocation and the treatment noncompliance describe above, does not show an ability to lawfully self-manage beyond the period of supervision. Finally, the defendant has not

remained in substantial compliance with all conditions of his supervision.

The clinician assigned to the defendant, Julie Rosania, LCSW, has been consulted on this matter, and joins the [PO] in opposition to the request.

*Gov't's Opp'n* at 1-2. The Government says that "[b]ased on the foregoing, USPO objects to granting him early termination of supervised release at this time," *id.* at 3, and the Government "concurs with the position of the [PO]." *Id.*

### C.    Lorne Armstrong's Reply

In his reply, Mr. Armstrong says that the "government acknowledges that 18 U.S.C. § 3583, not the [PO]'s internal Administrative Office criteria controls the consideration of [his] motion." *Def.'s Reply* at 2. Mr. Armstrong notes that the "statute does not distinguish between types of offenses (e.g. sex offenses)" and instead "focuses. . . on the fact that the Court must be 'satisfied that such action is warranted by the conduct of the defendant and the interest of justice.'" *Id.* at 2-3. Mr. Armstrong urges the Court to make its determination "guided at least in part by temporal considerations. In other words, the Court must determine the 'conduct of the defendant and the interest of justice' at fixed points of time." *Id.* at 3.

Mr. Armstrong points out that the statute "invites the Court to consider the possibility of termination after . . . at least one year of supervision" and that he "has been on supervision for more than a decade." *Id.* He reiterates that "the violations that supported his one prior revocation [took place] nearly five years ago." *Id.* Beyond the PO's statement that Mr. Armstrong engaged in noncompliant conduct,

there is no "specificity that would allow the Court to know when this 'conduct' occurred." *Id.*

Mr. Armstrong argues that the substance of his request for early termination tracks the Court's comments to him during its sentencing hearing on his revocation. *Id.* at 3-4. Mr. Armstrong posits that he has done what the Court directed him to do, and he now asks that the Court consider termination of his supervised release. *Id.* In fact, Mr. Armstrong argues that he has gone beyond mere compliance and has done such positive activities as starting his own business and becoming a father. *Id.* at 4. Mr. Armstrong represents that his motion for early termination was disseminated on the internet shortly after it was filed, and he stresses that he is seeking the "freedom to physically relocate to a location unknown to these groups." *Id.*

## III.   LEGAL STANDARDS

Once a defendant has served one year of supervised release, under 18 U.S.C. § 3583(e)(1), a court is authorized to terminate the remaining period of supervised release and discharge the person "if it is satisfied that such action is warranted by the conduct of the defendant released and the interest of justice." The statute states that a court "may, after considering the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(4), (a)(5), (a)(6), and (a)(7), terminate a term of supervised release . . .." 18 U.S.C. § 3583(e)(1). These factors include the "nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1), to "afford adequate deterrence to criminal

conduct," *id.* § 3553(a)(2)(B), to "protect the public from further crimes of the defendant," *id.* § 3553(a)(2)(C), the "applicable category of offense committed by the applicable category of defendant," *id.* § 3553(a)(4), the "pertinent policy statement" of the Sentencing Commission, *id.* § 3553(a)(5), the "need to avoid unwarranted sentencing disparities," *id.* § 3553(a)(6), and the "need to provide restitution to any victims." *Id.* § 3553(a)(7).

As the Court is not satisfied that either the conduct or the interest of justice standards has been met, the Court does not resolve whether mere compliance with the terms of supervised release in this case may be enough to order early termination or whether something more is necessary. *Compare United States v. Seger*, No. 1:98-cr-00065-JAW, 2014 U.S. Dist. LEXIS 151558, at *17 (D. Me. Oct. 27, 2014); *with United States v. Harris*, 258 F. Supp. 3d 137, 149-50 (D.D.C. 2017). Some courts require a defendant to demonstrate changed circumstances, such as exceptionally good behavior. *See United States v. Hawatmeh*, No. LA CR 08-00385-VBF-3, 2014 U.S. Dist. LEXIS 188084, at *11 (C.D. Cal. Sept. 19, 2014). Others do not. *United States v. Shaw*, 445 F. Supp. 3d 1160, 1166 (D. Colo. 2020) (declining to require "exceptional behavior" before terminating a term of supervised release because neither 18 U.S.C. § 3583(e)(1) nor 18 U.S.C. § 3553(a) textually imposes that requirement). "[T]he Commission has not promulgated any guidelines or policy statements addressing early termination of supervised release, but limited its policy guidance to violations of supervised release." *United States v. Kline*, No. CR 14-

1500-TUC-CKJ, 2021 U.S. Dist. LEXIS 133255, *4, n.2 (D. Ariz. July 16, 2021) (quoting *Harris*, 258 F. Supp. 3d at 145; and citing U.S.S.G., Ch. 7, Pts. A&B).

It strikes the Court that a decision to terminate a term of supervised release is too case-specific to draw hard rules beyond what the statutory language requires for what is essentially a discretionary decision. Consistent with its prior rulings, "in the Court's view, 'compliance with the terms and conditions of . . . supervised release, though laudable, is generally not grounds for early termination.'" *United States v. Farmer*, No. 1:05-cr-00088-JAW, 2015 U.S. Dist. LEXIS 145925, at *6 (D. Me. Oct. 28, 2015) (quoting *Seger*, 2014 U.S. Dist. LEXIS 151558, at *17).

Of course, a general rule is only generally applicable. In a given case, a defendant may have complied with the terms of his release, but his prior conduct and background may compel ongoing supervision because, for example, the nature of the crime presents a significant risk to a vulnerable population; however, a different defendant with a different criminal and personal history may make the case for early termination by compliance alone.

The statute requires a court to consider the factors listed in § 3553(a), and it imposes twin overarching requirements: that the court evaluate the "conduct of the defendant released" and the "interest of justice." 18 U.S.C. § 3583(e)(1). What is clear is that the defendant bears the burden of proving entitlement to early termination of supervised release. *See United States v. Weber*, 451 F.3d 552, 559 n.9 (9th Cir. 2006).

11

## IV.   DISCUSSION

### A.   The Nature and Circumstances of the Offense

The Presentence Investigation Report (PSR) in this case described Mr. Armstrong's offense conduct. *Presentence Investigation Report* ¶¶ 8-10. Between September 17, 2007 and October 18, 2007, Mr. Armstrong chatted online with "kayla_princess94," a person he believed to be a 13-year-old minor. *Id.* ¶ 8. However, this person was actually a participant in the Kentucky Bureau of Investigations (KBI) undercover sting operation whose goal was to expose online sexual predators. *Id.*

A portion of the online chats between Mr. Armstrong and "Kayla" were sexually explicit and contained discussions of oral, vaginal, and anal sex. *Id.* ¶ 9. There were over 400 pages of printed chat material between Mr. Armstrong and "Kayla" during this offense. *Id.* In addition to being extensive, the chats involved graphic discussions between Mr. Armstrong and "Kayla." *Id.* The chat revealed that Mr. Armstrong instructed "Kayla" on how to delete evidence of their chats so her parents would not be able to see they had been communicating, encouraged her to buy a prepaid telephone card so that they could speak on the phone without the call showing up on her parent's telephone bill, and taught her how to masturbate. *Id.*

During this time, Mr. Armstrong, in addition to chatting, transmitted several nude images of himself to "Kayla" using a webcam. *Id.* These images included him just walking around naked as well as very close screenshots of his genitals. *Id.* In

his chats, Mr. Armstrong would ask "Kayla" if she would like to touch him and explained how she could cause "white stuff" to come out of him. *Id.*

On October 18, 2007, Mr. Armstrong left his home in Tennessee and drove approximately an hour and a half to Bowling Green, Kentucky, to have sex with "Kayla." *Id.* ¶ 10. When he arrived at what he believed to be "Kayla's" residence, he was arrested by KBI agents. *Id.* During a search of Mr. Armstrong's vehicle, agents found a box of 14 condoms, a digital camera, and a silver bracelet he intended to gift to "Kayla." *Id.*

## B.    History and Characteristics of Lorne Armstrong

There is nothing in Mr. Armstrong's personal background that would have predicted his commission of this federal crime.

At the time of the offense, Mr. Armstrong was thirty-seven. *Id.* ¶ 2. Mr. Armstrong grew up in the state of Maine, graduated from high school, and enlisted in the U.S. Air Force. *Id.* ¶¶ 33-57. Unlike some cases where child sexual abuse is an issue, there is no suggestion that when Mr. Armstrong was a child, he was abused in any way. *Id.* ¶ 35. Mr. Armstrong spent two years in the Air Force, leaving in 1993. *Id.* ¶ 33. After the Air Force, Mr. Armstrong moved around, ultimately deciding to try his hand at singing and ending up in Nashville, Tennessee. *Id.* After a time, he returned to Maine. *Id.*

His prior criminal history consisted solely of a conviction in 2006 for operating under the influence in Maine for which he was sentenced to two days in

jail, a $500 fine, and a ninety-day license suspension. *Id.* ¶ 28. He was a criminal history category I. *Id.* ¶ 29.

### C.     Lorne Armstrong's First Period of Supervised Release

After completing his incarceration, Mr. Armstrong returned to Maine and began supervised release on November 5, 2012. *Transfer of Juris.* at 1. As the recitation of Mr. Armstrong's period on supervised release reveals, he faltered during his initial period of supervised release. The PSR stated that Mr. Armstrong was a social drinker but also said that he had a "borderline problem with his consumption of alcohol and that he feels he would benefit from treatment for alcohol abuse." *PSR* ¶ 42. There was no suggestion that his crime was related to substance abuse, and Judge Russell waived the mandatory drug testing condition and prohibited him only from the excessive use of alcohol. *J.* at 4.

After a time, Mr. Armstrong began to show signs of trouble with alcohol. On September 15, 2015, during a home inspection, Probation Officers (PO) discovered that Mr. Armstrong was excessively consuming alcohol, which he said was related to a troubled romantic relationship. *October 2015 Req. for Modification* at 2. Then on October 7, 2015, Mr. Armstrong showed up to his Sex Offender Treatment Program meeting under the influence of alcohol. *Id.* In addition, Mr. Armstrong had been the subject of a "no contact" harassment order and was also dishonest with the PO. *Id.* The PO recommended that the Court add a new condition of supervised release, restricting Mr. Armstrong from the use of alcohol and

compelling his attendance at a program of drug and alcohol abuse therapy. *Id.* at 1. The Court granted the modification on October 9, 2015. *Oct. 2015 Order.*

After a time, Mr. Armstrong began to show more signs of trouble with alcohol. On July 26, 2027, the Maine State Police were called to his residence for a welfare check from a caller reporting that Mr. Armstrong was suicidal, and the State Police found Mr. Armstrong sitting with multiple open cans of beer in front of him. *July 2017 Req. for Modification* at 2. Mr. Armstrong denied that he was suicidal. *Id.* Mr. Armstrong contacted his PO and acknowledged that he had a problem with alcohol, resulting in an alcohol monitoring and treatment condition. *Id.*; *July 2017 Order.*

On July 25, 2018, the PO filed a petition for warrant. *July 2019 Pet.* On October 1, 2019, Mr. Armstrong admitted four of the violations, *see Min. Entry* (ECF No. 33), and the Court sentenced Mr. Armstrong to six months of incarceration and supervised release for life. *Revocation J.* at 3-4. As noted earlier, the admitted violations included (1) excessive use of alcohol, (2) multiple uses of alcohol after the Court imposed a no-alcohol condition, (3) failure to submit to required breath tests, and (4) being suspended from mandated sex offender treatment by failing to reveal alcohol use. *Id.*

### D.     Lorne Armstrong's Second Period of Supervised Release

Mr. Armstrong completed his six-month term of incarceration on February 5, 2021. Mr. Armstrong has done well over the last three-plus years of supervised release. The PO says that he has participated in sex offender treatment and has

15

started his own business, and notes that he has committed no violations of the conditions of supervised release that have required notifying the court.

### E.    Specific Deterrence

The major issue in this motion is specific deterrence. The nature and circumstances of Mr. Armstrong's offense are egregious. Even though he committed the offense a long time ago, Mr. Armstrong's crime broke moral and legal norms. He repeatedly contacted someone he thought was a thirteen-year-old girl, engaged in hundreds of sexually explicit communications with her, and arranged to meet her for what he thought was going to be a sexual encounter after weeks of grooming her. He then drove over sixty miles to meet her. When he engaged in this abhorrent and risky conduct, he was thirty-seven years old, almost three times the age of his assumed victim and well into adulthood. This was not the impulsive crime of a man in his teens. It was the deliberate, planned crime of a man nearing middle age. In evaluating Mr. Armstrong's motion, the Court has considered that his purported victim was only thirteen, barely a teenager and vulnerable.

There is evidence in the record that Mr. Armstrong, now fifty-four, has finally stabilized his life with a new relationship, an expected child, secure employment, sobriety, and a commitment to counseling. This is all commendable. However, his period of stability is far too short to give the Court the necessary confidence that he has effected a permanent change. During the three years plus since his release from his last incarceration, Mr. Armstrong has been under the close scrutiny of the Probation Office with restrictions against internet access and alcohol use, contact

with minors under eighteen, and requirements of alcohol and sex offender treatment. *See Revocation J.* at 1-6. His compliance with these conditions is encouraging, but the true tests will come if and when the Probation Office begins to relax some of these conditions.

Given the extraordinary risk his past life demonstrates to a vulnerable population and his prior spotty record on supervised release, the Court will require a much longer period of self-discipline before it seriously considers terminating his supervised release, which his sentencing judge imposed for the rest of his life. In making these assessments, the Court will necessarily lean on the opinions of the professionals who are dealing with Mr. Armstrong on an ongoing basis, and if he wishes to be successful, he should continue to comply with the conditions of supervised release and seek the unequivocal support of the Probation Office and his counselors.

## V.    CONCLUSION

The Court DISMISSES without prejudice Defendant's Motion for Early Termination of Supervised Release (ECF No. 47).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 10th day of July, 2024

17